AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☒ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| CEZAR PETRE BARBU, aka "Oase," | Case No.   2:23-mj-05195 |
| Defendant. | |

**FILED**
CLERK, U.S. DISTRICT COURT

10/8/2023

CENTRAL DISTRICT OF CALIFORNIA
BY:     clee     DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about August 1, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC § 1344(2) | Bank fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/ Jacqueline Cenan_
*Complainant's signature*

Jacqueline Cenan, USSS Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     October 8, 2023

*Steve Kim*
*Judge's signature*

City and state:   Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA: Haoxiaohan Cai, x0762

## AFFIDAVIT

I, JACQUELINE CENAN, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrants against Petruta Feraru ("FERARU") and Cezar Petre Barbu aka "Oase" ("BARBU") for violations of Title 18, United States Code, Section 1344(2) Bank Fraud.

2.   This affidavit is also made in support of an application for warrants to search the following: FERARU and BARBU's residence at 1760 El Cerrito Pl., Apartment #15, Los Angeles, CA 90028 (the "SUBJECT PREMISES") as described more fully in Attachment A-1; the person of FERARU, as described more fully in Attachment A-2; and the person of BARBU, as described more fully in Attachment A-3.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1029 (Access Device Fraud), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and

search warrants, and does not purport to set forth all of my
knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent ("SA") with the United States
Secret Service ("USSS") and have been so employed since March
2021. In this capacity, I am responsible for investigating
violations of federal criminal laws relating to financial
institution fraud, credit card fraud, bank fraud, cybercrimes,
and identity theft. I am a graduate of the Criminal Investigator
Training Program conducted at the Federal Law Enforcement
Training Center in Glynco, Georgia, as well as the USSS Special
Agent Training Course in Beltsville, Maryland. I have received
advanced training in financial and cybercrime investigations
including the Basic Investigation of Computers and Electronic
Crimes Program, Basic Network Intrusion Responder Training, and
I have received continued education related to the investigation
and prosecution of cybercrimes. I have participated in multiple
investigations in connection with fraud and cybercrimes.

## III. SUMMARY OF PROBABLE CAUSE

6.   As part of its ongoing investigation into fraud
against the State of California's Electronic Benefits Transfer
("EBT") and Employment Development Department ("EDD") cards, in
May 2023, Secret Service investigated a tip originating in
Bucharest, Romania, about a card skimming and access device

2

fraud operation perpetrated by multiple suspects located in Los Angeles, California, including Petruta Feraru ("FERARU") and Cezar Petre Barbu ("BARBU").

7.    Physical surveillance, bank records, and ATM surveillance footage confirm that FERARU and BARBU are engaged in bank and access device fraud against vulnerable Californians receiving benefits from California's Employment Development Department ("EDD"), and that both targets current reside at 1760 El Cerrito Pl., Apartment #15, Los Angeles, CA 90028 (the "SUBJECT PREMISES").

8.    For example, on the night of July 31, 2023, FERARU fraudulently accessed three Bank of America debit card accounts issued to EDD benefits recipients, withdrawing money from two of those accounts, as well as another debit card account which was not EDD.  ATM surveillance footage showed FERARU was wearing a red/purple wig and glasses while she made the fraudulent withdrawals to disguise her appearance.  Afterward, FERARU returned to the SUBJECT PREMISES.

9.    The next day, on August 1, 2023, BARBU was surveilled leaving the SUBJECT PREMISES and traveling to a Bank of America located on La Brea Ave., in Los Angeles. ATM surveillance footage and bank records show that BARBU used three EDD cards (not his own) to withdraw approximately $3,500. Prior to his withdrawals, BARBU conducted balance inquiry checks on all three cards, plus an additional card which he did not withdraw money from. BARBU then drove back to the SUBJECT PREMISES.

10.  As discussed below, FERARU and BARBU both have criminal convictions for fraud in multiple European countries. FERARU is a Romanian national who is in the United States without authorization and BARBU is believed to have a similar background.

11.  On October 6, 2023, the Secret Service received information from a Source of Information in Romania that FERARU and BARBU intended to leave the United States within the next few days.  Thus, the USSS seeks this complaint, arrest warrants, and search warrants, which will be executed before FERARU and BARBU flee the country.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.  Regulatory Background of CalFresh and CalWORKs Programs**

13.  DSS is a government agency that administers several benefit and assistance programs for residents of the state of California. One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs. Another assistance program administered by DSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses. Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits

at www.getcalfresh.org and www.benefitscal.com. Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

14.  CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards"). EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

15.  California public benefits associated with California's Employment Development Department (EDD) are being stolen in a similar way to CalFresh and CalWORKS benefits. In California, the EDD administers unemployment insurance, disability insurance, and paid family leave programs. EDD benefits, like EBT benefits, are distributed via electronic transfers to an access device card that, similar to a debit card, enable the user to make cash withdrawals and payments. In California, EDD benefits are distributed through an EBT card issued by Bank of America.

16.  The EBT and EDD cards are assigned specific Bank Identification Numbers ("BIN"). A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs or Bank of America, which administers the EDD programs. Benefits received through the program are typically disbursed to cardholders

during the early days of each month. Those benefits are deposited directly into the account of the EBT and/or EDD cardholder.

17.   The cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder. The cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds.

**B.   Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

18.   Since in or about August 2022, federal, state, and local law enforcement have been working to investigate a significant increase in unauthorized cash withdrawals utilizing EBT and EDD cards. Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

19.   A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe. Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe. Cloning these cards allows the suspect to use the card and the benefits added on to the account linked to the

card for illicit purchases or unauthorized cash withdrawals. On a legitimate debit or credit card, the information coded on the card's magnetic stripe will match the information embossed on the front of the card. This information includes the account number, expiration date, and cardholder's name, among other information. Whereas on a cloned card, the information coded on the magnetic stripe will not match the information embossed on the front of the card. For example, if a suspect re-encodes victim EDD card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be coded with the EDD card information, but the card itself will still bear the information of the gift card or bear no information if it is a blank white plastic card.

20.   Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

21.   The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals. For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN

number. Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device. As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming. Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

22.  In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area. This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period of time. Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

23.  As a result of this operation, local law enforcement established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud. Law enforcement surveilled those ATMs around the dates when benefits had been disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in

rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits.

24.  As a result, law enforcement arrested approximately 16 suspects. All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States.

25.  In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs. Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession. Two of those defendants came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022. One additional defendant possessed over 200 cloned EDD cards at the time of arrest, and later analysis of historic ATM surveillance data showed that the defendant had made more than $70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023. All three of these defendants

were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.

26.  In or about March 2023, federal law enforcement conducted another surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs. Law enforcement arrested eleven suspects that conducted a high volume of unauthorized transactions and that conducted those transactions in rapid succession. At the time of their arrest, the suspects had in their possession over 400 cloned cards, $120,000 in illicitly obtained funds, and multiple skimming devices.

27.  Ten out of the eleven of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.

**C.  FERARU and BARBU Are Identified in ATM Skimmer and Access Device Fraud Scheme**

28.  In May 2023, the USSS began investigating a cell of suspected foreign nationals engaging in skimming and illicit ATM withdrawals in and around Los Angeles. As part of this investigation, the USSS received actionable information from a source of information ("SOI")[1] working with a Foreign Service National Investigator ("FSNI") located in Bucharest, Romania, that he/she was aware of a scheme where suspects, including FERARU and BARBU, would install skimmers at bank ATMs, harvest

---

[1] The SOI is a Romanian national.  The SOI has no known criminal history and is not receiving compensation for his/her information. As discussed below, USSS has corroborated information provided by the SOI.

victim account information, and take out money from victim accounts during the first five days of each month in Los Angeles.

29.    According to the SOI, FERARU was called into an U.S. immigration office and provided her real address to an immigration officer. Also according to the SOI, FERARU used her real address when she created her Bank of America account. The SOI also advised that FERARU lives with or in close proximity to at least two other subjects engaged in skimming and access device fraud, including BARBU, who the SOI identified as the leader of the skimming and access device fraud ring.

**D.    On July 31, 2023, FERARU makes Fraudulent Withdrawals at the Westlake Bank of America**

30.    Law enforcement corroborated the SOI's tip.  In June 2023, the USSS learned from Homeland Security Investigations ("HSI") that FERARU is enrolled in an Alternative to Detention ("ATD") program, administered by Immigration and Customs Enforcement ("ICE"). ATD is a program for adults in removal proceedings or subject to a final order of removal which may allow community placement in lieu of custody.  When she checked in with an immigration office, FERARU identified 1760 El Cerrito Place, Los Angeles, CA 90028 (i.e., the SUBJECT PREMISES) as her address.

31.    Additionally, records from Bank of America confirm that FERARU lists the SUBJECT PREMISES as her address.

32.    On or about July 27, 2023, law enforcement traveled to the SUBJECT PREMISES and saw that mailbox #15 of the apartment

complex located at 1760 El Cerrito Place, in Los Angeles --- the mailbox assigned to the SUBJECT PREMISES --- had a sticker with the name "PETRUTA FERARU" on it.  At this time, FERARU's was the only name on the mailbox.  While walking around the complex in an undercover capacity, law enforcement saw FERARU exit apartment #15 twice. The first time, FERARU came out of apartment #15 only to immediately return inside. The second time, FERARU came out of apartment #15 and asked the undercover agents why they were in the complex. The agents responded that they were looking for an apartment to rent. FERARU returned inside apartment #15.

33.  On or about July 31, 2023, at approximately 9:45 p.m. (PST), law enforcement conducted physical surveillance at SUBJECT PREMISES. At or about 10:30 p.m., law enforcement saw FERARU drive a dark grey 2022 Volkswagen bearing California license plate 9CMH620 ("Vehicle 1"). FERARU stopped right next to a white 2022 Ford bronco bearing California license plate 9CKT393 ("Vehicle 2") which was parked in front of the SUBJECT PREMISES. FERARU parked and exited Vehicle 1 and transferred items from the Vehicle 2 to Vehicle 1. FERARU reentered Vehicle 1 and proceeded to drive approximately 35 minutes to the Bank of America branch located at 30895 E 1000 Oaks Blvd, Westlake Village, CA 91362 (the "Westlake Bank of America"). Bank of America is a federally insured bank.

34.  While in route to the Westlake Bank of America, FERARU, was observed executing multiple countersurveillance maneuvers including, but not limited to exiting a freeway only

to immediately reenter the same freeway, alternating between unusually fast and slow speeds on the freeway, and utilizing multiple U-turns and "squaring the block" techniques in order to avoid law enforcement detection and surveillance. At approximately 11:05 p.m., law enforcement saw Vehicle 1 in the parking lot of the Westlake Bank of America.

35.  Inside the bank, law enforcement saw FERARU standing at and apparently using the ATM.  At approximately 11:12 p.m., law enforcement saw FERARU walk back to Vehicle 1. FERARU was observed wearing a white hat, white pants, and a jean/blue shirt. After circling the Bank of America parking lot, Vehicle 1 left the parking lot at approximately 11:15 p.m. Based on records obtained by law enforcement from Bank of America, FERARU was identified in ATM surveillance video from the Westlake Village ATM terminal. In the surveillance video, FERARU utilized a disguise to conceal her identity, specifically, a white hat, sunglasses, and a dark-colored wig.  The left photograph is an image of FERARU without a disguise taken from an immigration appointment FERARU attended; the right photograph is a

screenshot depicting FERARU while at the ATM at the Westlake
Bank of America:

 

36.   As reflected in ATM surveillance footage and bank
records, FERARU used three cards encoded with EDD account
information belonging to other people to obtain approximately
$560 in EDD funds.  Specifically, FERARU made balance inquiry
checks on one EDD account and did not make a withdrawal.  She
also accessed two other EDD accounts to make withdrawals from
each of those accounts.  One of these transactions comprised of
a $400 withdrawal from the EDD account ending in 0657.

37.   On August 18, 2023, at approximately 3:39 p.m., law
enforcement interviewed victim D.K., the rightful owner of the
EDD card ending in 0657, who stated that he did not give anyone
permission to be in possession of his EDD card information, nor
did he give anyone permission to utilize his EDD account
information to withdraw money.

38.   Prior to her withdrawals, bank records show that
FERARU conducted balance inquiry checks on all three cards, plus
an additional card ending in 9994, which she did not withdraw

money from.  In my training and experience, I know it is common for fraudsters engaged in EDD and EBT fraud to conduct balance inquiry checks the night before benefits are expected to be distributed to victim accounts (i.e., the first of the month), so that they can empty any remaining card balance from the month before and to verify that all the cards and their respective PINS are functioning properly.

39.  Law enforcement continued surveillance of FERARU.  At approximately 12:34 p.m., FERARU returned to the SUBJECT PREMISES.  FERARU, however, circled the block in Vehicle 1 before entering her parking garage for the SUBJECT PREMISES.

### E.   On August 1, 2023 BARBU Makes Fraudulent EDD Withdrawals at the La Brea Bank of America

40.  The next day, August 1, 2023, at approximately 9:45 p.m., law enforcement conducted physical surveillance at the SUBJECT PREMISES.

41.  At or about 11:30 p.m., Vehicle 1 exited the parking garage and drove to the Bank of America branch located at 466 N. La Brea Ave, Los Angeles, CA 90036 (the "La Brea Bank of America"). At this branch, law enforcement saw a male, later identified as BARBU,[2] wearing a hat exit the driver's seat of Vehicle 1 and walk into the bank.

---

[2] This man was identified as BARBU by comparing him to a photograph of BARBU from a Romanian law enforcement database. Additionally, when shown this picture, the Romanian SOI who has met BARBU believed the individual to be BARBU.



42.   Based on ATM surveillance video from the La Brea Bank of America, I identified BARBU engaging in transactions at the ATM. In the surveillance video, BARBU is depicted wearing a light grey hat. Additionally, the video shows BARBU scratching his ear during while holding a card with what appears to be a pink circular sticker attached to it. Based on my training and experience, I know that EBT and EDD fraudsters commonly place stickers on cloned EBT and EDD cards and use those stickers as a place to write down their victim's PIN codes. PIN codes are necessary to access funds and information associated with the underlying accounts. Fraudsters who commit fraud are often doing fraud in bulk and need an easy way to recall the PINs associated to stolen accounts.

43.   At approximately 11:46 p.m., BARBU exited the bank, returned to Vehicle 1, and drove back to the parking garage at the SUBJECT PREMISES.

44.   Bank records from Bank of America show that BARBU accessed three EDD accounts in different names and withdrew approximately $3,500 while at the La Brea Bank of America ATM. Prior to his withdrawals, BARBU conducted balance inquiry checks on all three EDD accounts, plus an additional balance inquiry on an EDD account which he did not withdraw money from. One of the EDD accounts ending in 6822 was used by BARBU to execute a balance inquiry and then to make two withdraws in the amounts of $1,000.00 and $980.00.

45.   On October 7, 2023, at approximately 3:11 p.m., law enforcement interviewed victim Z.R., the rightful owner of the EDD card ending in 6822, who stated that she did not give anyone permission to be in possession of her EDD card information or to utilize her EDD card information to withdraw funds.

**F.   Law Enforcement Attempt to install Tracking Devices On Vehicles 1 and 2 But Find that They Had Been Replaced with Vehicle 3**

46.   On September 6, 2023, law enforcement received federal warrants for tracking devices for Vehicle 1 and Vehicle 2 that FERARU and BARBU utilized to commit the fraud described above. Vehicle 1 is registered to Revlux LLC,[3] Abtahi Seyed Moshen and Vehicle 2 is registered to Abtahi Seyed.

47.   On September 11, 2023, law enforcement attempted to install the tracking devices to Vehicle 1 and Vehicle 2 but found that both vehicles were exchanged with new vehicles. In my training and experience, individuals engaging in access device

---

[3] REVLUX LLC is a rental car company led by Abtahi Seyed and his family in Southern California.

fraud and skimming activities frequently use rental cars and switch their cars to make law enforcement surveillance and detection more difficult.

48.  In the parking garage of the El Cerrito complex, law enforcement found a 2022 dark grey Volkswagen with the California license plate 9CMT473 ("Vehicle 3"). Vehicle 3 is registered to VW Credit LSG and Hossein Ferial, the mother of Abtahi Seyed of REVLUX LLC.

49.  In my training and experience, individuals engaging in EBT and EDD fraud frequently switch their vehicles in order to make physical surveillance more difficult for law enforcement. Additionally, swapping vehicles makes it more difficult for law enforcement to tie the fraudsters to historical crimes, to install and retrieve vehicle tracking devices, and to execute vehicle search warrants.

**G.   FERARU and BARBU Currently Live At the SUBJECT PREMISES But Are Likely to Flee The United States**

50.  On October 6, 2023, I was advised by the Romanian SOI that FERARU and BARBU are thinking of leaving the United States in the next five days. According to the SOI, FERARU and BARBU were happy with the amount of money that they made in the previous months and are ready to return to Romania.

51.  In my training and experience, fraudsters often will leave the United States to spend their illicit funds abroad where their family is located and where the general cost of living is cheaper. The fraudsters will spend their illicit gains on land, property, and their lifestyle and return to the United

States to commit fraud when they need to make more money, often under different aliases.

52.   Upon learning of their upcoming departure, on October 7, 2023, I conducted physical surveillance of the SUBJECT PREMISES.  This showed that the apartment #15 mailbox had the same "PETRUTA FERARU" sticker that was previously observed on July 27, 2023, plus a new sticker, with the name "Cezar Petre Barbu," indicating that both FERARU and BARBU currently live at the SUBJECT PREMISES.

### H.   Both FERARU and BARBU Have Fraud Convictions in Multiple European Countries

53.   Based on my review of domestic and foreign law enforcement database records, FERARU was sentenced in the United Kingdom to 15 months for fraud in 2012 and 20 months for fraud in 2013, as well as ordered to pay criminal fines in Germany for theft and fraud in 2016, 2018, and 2020.

54.   Based on my review of domestic and foreign law enforcement database records, BARBU was sentenced to 6 years for theft in 1988 and 4 years for manslaughter in 2007, both in Romania. BARBU was sentenced to 8 years for fraud in Greece in 2012, 10 months for theft in Ireland in 2016, 6 months for theft in Sweden in 2019, 12 months' probation for fraud in Finland in 2019, 4 months' probation for computer fraud in Denmark in 2019, as well as criminal fines for theft in Ireland in 2016 and Germany in 2020.

### V.  TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT

55.  Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a.    Individuals engaged in ATM fraud often use vehicles and their residences to further their fraud and keep records related to their fraud schemes. Based on my training and experience, these individuals utilize their vehicles to meet with co-conspirators to purchase skimming devices and device-making equipment and to exchange cloned cards and proceeds of the fraud such as cash. These individuals need places to store the skimming devices, devices making equipment, cloned EDD cards, and other tools used to commit EDD fraud, and one of the primary locations where they do is their residences, especially where, as here, multiple fraud participants live at the same residence. Additionally, as seen in the case of FERARU, individuals engaging in access device fraud will often use their vehicles and residences to store tools and objects that aid them in the committal of fraud, such as disguises.

b.    It is a common practice for those involved in access device fraud to use either false identification or stolen real identification to make purchases with stolen access devices at retail stores in order to avoid detection and to complete the transaction.  Those who engage in such fraud keep evidence of such retail transactions in their homes and cars.

c.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and

identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers. Such equipment and software are often found in thieves' and fraudsters' residences and vehicles.

d. It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

e.    Oftentimes identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

f.    It is also common for mail and identity thieves to keep "profiles" of victims on digital devices or in paper form inside their residences.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

g.    Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[4]

56.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as
*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

      a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.  Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the

---

paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

57.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so

many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

58.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after

a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

         c.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress FERARU and/or BARBU's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of FERARU and/or BARBU's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    59.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII.  <u>Request for Attestation by Telephonic or Reliable Electronic Means</u>

    60.  Pursuant to Rule 41(d) and 4.1, I request authorization to remotely attest to the contents of this affidavit.  Agents, including myself, anticipate executing the arrest warrants and search warrants tomorrow, Monday, October 9, 2023 in order to apprehend the suspects before their flight from this country.  Agents have been diligently conducting physical surveillance at the SUBJECT PREMISES upon learning of the suspects' anticipated departure, and are actively engaged in operational planning for the execution of the search and arrest warrants int his case.  Good cause exists for telephonic

attestation to permit agents to pursue operational planning in the lead up to execution.

### VIII.      CONCLUSION

61.  For all of the reasons described above, there is probable cause to believe that FERARU and BARBU have committed violations of Title 18, United States Code, 1344(2) (Bank Fraud).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A-1, and on the persons of FERARU and BARBU, as described in Attachments A-2 and A-3, respectively.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _8th___ day of
October 2023.

*Steve Kim*
_____
THE HON. STEVE KIM
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

PREMISES TO BE SEARCHED

The premises to be searched is located at 1760 El Cerrito Pl, Apartment #15, Los Angeles, CA 90028 (the "SUBJECT PREMISES").  The SUBJECT PREMISES is Apartment #15 located within a two-story apartment complex with a glass front door and a gated garage. Apartment #15 is located on the second floor, in the far right corner of the complex. The garage is accessible from El Cerrito Place and connects to the inside of the apartment complex.  The search of the SUBJECT PREMISES includes the search of any vehicles parked in parking spots assigned to the SUBJECT PREMISES.



**<u>ATTACHMENT A-2</u>**

<u>PERSON TO BE SEARCHED</u>

The person of Petruta Feraru ("FERARU"), date of birth 7/10/1975, with Romanian ID # VX658256, Romanian passport # 060199101, and FBI#: J5A07J5K0. Law enforcement reports list FERARU as being 5 feet 3 inches and approximately 181 pounds with brown eyes and black hair. However, law enforcement surveillance has observed FERARU with blond hair as well as wearing a red/purple wig.

The search of FERARU shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within FERARU's immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a strip search or a body cavity search.

 

**ATTACHMENT A-3**

PERSON TO BE SEARCHED

The person of Cezar Petre Barbu ("BARBU"), date of birth 06/28/1964 and the Romanian passport # 060985138.

The search of BARBU shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within BARBU's immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a strip search or a body cavity search.




**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband,
fruits, or instrumentalities of violations of Title 18, United
States Code, Sections 1028 (Fraud and Related Activity in
Connection with Identification Documents, Authentication
Features, and Information), 1029 (Access Device Fraud), 1344
(Bank Fraud), and 1028A (Aggravated Identity Theft) (the
"Subject Offenses"), namely:

      a.   Data, records, documents, or information
(including electronic mail and messages) pertaining to
obtaining, possessing, using, or transferring personal and/or
financial transaction identification information for persons
other than FERARU and BARBU, such as names, addresses, phone
numbers, credit and debit card numbers, security codes, bank
account and other financial institution account numbers, Social
Security numbers, email addresses, IP addresses, as well as PIN
numbers and passwords for financial institutions or internet
service providers;

      b.   Records, documents, programs, applications, or
materials pertaining any bank accounts, credit card accounts, or
other financial accounts, including applications for, or use of,
credit or debit cards, bank accounts, or merchant processor
accounts;

      c.   Data, records, documents (including e-mails), or
information reflecting or referencing purchases of merchandise,
securities, electronic currency, and other valuable things;

d.   Records, documents, programs, applications, or materials relating to United States mail or mail matter;

e.   U.S. currency in excess of $1,000, including the first $1,000 if more than $1,000 is recovered, bearer instruments worth over $1,000 (including cashier's checks and traveler's checks), and precious stones worth more than $1,000;

f.   Any altered, counterfeit, or fraudulent identifications, checks, access devices, monetary instruments, or other official documents;

g.   Any documents or records, including receipts, invoices, bank statements, and credit card statements, evidencing the purchase of any products or services using altered, counterfeit, or fraudulent or unauthorized checks, access devices, or other monetary instruments;

h.   Any products, goods, or merchandise purchased with fraudulent or unauthorized checks, access devices, or other monetary instruments;

i.   Any identifications, checks, access devices, monetary instruments, or other official documents that are not addressed to, or in the name of, FERARU and BARBU;

j.   Any tools or equipment, such as computers, software, printers, scanners, skimming devices, embossing machines, credit card readers or encoders, washing chemicals, or imprinting tools, used or intended to be used to alter, counterfeit, or create fraudulent checks, access devices, or other monetary instruments;

k.   Records of off-site storage locations, including safe-deposit box keys, records, receipts, or rental agreements for storage facilities;

l.   Records related to applying for and/or receiving EDD or other government benefits in names other than FERARU and BARBU;

m.   Indicia of occupancy, residency or ownership of the SUBJECT PREMISES and things described in the warrant, including forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing;

n.   Contents of any calendar or date book stored on any of the digital devices;

o.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

p.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

q.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers

accessed through any push-to-talk functions, as well as all received or missed incoming calls;

r.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

s.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

t.   Audio recordings, pictures, video recordings, or still captured images of United States mail or mail matter, whether opened or unopened, or relating to the possession or distribution of drugs or the collection or transfer of the proceeds of the above-described offenses; and

u.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

v.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were

iv

created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

        h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

   5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

        a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

        b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

        c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

        d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

        e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

        f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress FERARU and/or BARBU's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of FERARU and/or BARBU's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.   In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

x

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.